# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                                   CRIMINAL NO. 12-106

VERSUS

REGINALD R. HARPER                                         SECTION "G" (3)
TROY A. FOUQUET

## ORDER AND REASONS

On February 15, 2012, the defendants, Reginald R. Harper ("Harper") and Troy A. Fouquet ("Fouquet") were charged by a one-count Bill of Information with conspiracy to commit bank fraud.[1] Both defendants waived their right to be charged by indictment.[2] On March 15, 2012, Fouquet pled guilty before this Court at his rearraignment as to the one count.[3] On April 26, 2012, Harper entered a plea of guilty as to the one count at rearraignment.[4] On March 15, 2013, this Court held a loss calculation hearing where the Court was presented with testimony and evidence regarding the loss sustained by First Community Bank ("FCB") as a result of the defendants' crimes for the purposes of restitution and sentencing. After considering the parties' pre-hearing briefs, arguments presented at the loss calculation hearing, post-hearing briefs, the record, and the applicable law, the Court makes its findings of fact and conclusions of law as follows.

---

[1] Rec. Doc. 1.

[2] Rec. Doc. Nos. 16, 22.

[3] Rec. Doc. 29.

[4] Rec. Doc. 35.

# I. Background

## A. Factual Background

In this matter, the facts are reflected in the factual bases, submitted by the Government and agreed to by the defendants when they entered their respective pleas of guilt.[5] Harper was First Community Bank's ("FCB") President and CEO, as well as a loan officer. Fouquet was a real estate developer. Fouquet received in excess of $3 million in loans from FCB, which were all managed and overseen by Harper.

While initially profitable, over time Fouquet became insolvent and could no longer repay his loans with FCB. Both Harper and Fouquet concealed this situation from FCB's board of directors, auditors, and regulators. The defendants used false bank records, nominee loans, and checks drawn on accounts with insufficient funds to conceal the delinquent loans for several years.

Harper was forced to resign from the bank on or about September 2009, and when FCB reviewed the Fouquet loans (among other loans made by Harper) it noticed significant losses. In response, FCB engaged in a "three-step process" to rid itself of the loans. First, at the behest of the FDIC, FCB wrote off more than $500,000 in losses because the collateral backing Fouquet's loans was determined to be overvalued. Second, FCB wrote off 18% of the remaining value of the loans (approximately $500,000) "based on FCB's assessment of declining market fluctuation relating to collateral and the anticipated costs to sell these properties." Third, after consulting with third parties, FCB decided to sell the remaining Fouquet loans, and the Government claims that upon this sale the bank incurred an additional loss of almost $600,000, making the total loss amount by the bank associated with the Fouquet loans, according to the Government, nearly $1.6 million.

---

[5] *See* Rec. Doc. Nos. 31, 37.

*B. Procedural Background*

After the defendants were charged and pled guilty, the Court scheduled a loss calculation hearing for September 6, 2012 to determine loss amounts, restitution, and other ancillary matters prior to sentencing.[6] Upon the unopposed motion of the United States, this Court continued the loss calculation hearing to November 8, 2012.[7] The United States then filed another unopposed motion to continue the loss calculation hearing, and the Court again rescheduled to December 6, 2012.[8] The parties then filed a joint request to continue the hearing date yet again, and the Court set the loss calculation hearing for January 7, 2013.[9]

On December 7, 2012, Harper requested a continuance of the loss calculation hearing so that he could benefit from the discovery in a related pending civil matter.[10] The Court heard oral argument on the motion on December 20, 2012, and denied the motion from the bench.[11] However, on January 7, 2012, an unrelated matter was set for trial, and the loss calculation hearing again had to be continued.[12] After a telephone conference with the parties, the Court set the loss calculation hearing for February 15, 2013.[13]

On January 18, 2013, both defendants filed motions to continue the loss calculation hearing,

---

[6] Rec. Doc. 46 at p. 2.

[7] Rec. Doc. 63.

[8] Rec. Doc. 66.

[9] Rec. Doc. 76.

[10] Rec. Doc. 82.

[11] Rec. Doc. 91.

[12] Rec. Doc. 92.

[13] Rec. Doc. Nos. 93, 94.

upon the defendants' claim that a recently discovered, and facially incriminating, document may have been forged.[14] The Court heard oral argument on the motion, and granted a short continuance of the loss calculation hearing until March 15, 2013.[15]  The Court finally held the loss calculation hearing on March 15, 2013.[16]

## II. Parties' Arguments

### A. Loss Amount

#### 1. United States' Arguments

The United States contends that FCB, the victim bank, suffered a total loss of approximately $1.6 million as a result of the defendants' fraud. The Government bases its calculation on a three-step process FCB undertook to rid itself of the loans at issue here.[17] First, pursuant to an FDIC mandate, FCB wrote down approximately $520,955.71 on the loans, based on differences in collateral values; in short, the bank had to adjust the value of the collateral on its books to account for the actual value of the collateral as appraised in 2009.[18] The United States claims that but-for the defendants' fraud, the bank would have been able to address some of the issues regarding these loans before 2009 and mitigated or prevented these losses.[19]

Second, FCB took a second write-down on the remaining value of these loans, encompassing

---

[14] Rec. Doc. Nos. 97, 98.

[15] Rec. Doc. 106.

[16] Rec. Doc. 111.

[17] Rec. Doc. 113 at p. 3.

[18] *Id.*

[19] *Id.* (citing Rec. Doc. 112 at pp. 80:4-81:3, Testimony of FDIC Examiner; *id.* at pp. 155:23-157:15, Testimony of Bank Representative Sean Bougious).

about 18% of the outstanding value, totaling a $493,933.61 reduction in value.[20] The United States argues that this write-down was undertaken after "FCB recognized they were unlikely to collect much, if anything, on the value of these loans."[21] Again, the United States maintains that this is attributable to Harper and Fouquet's fraud because if the "scheme" had not been concealed for years, FCB might have mitigated against these losses.[22]

Third, the United States claims that pursuant to FDIC instructions and a unanimous decision by its Board of Directors, FCB sold most of these loans to third parties, such as 110 Capital, LLC and Michael Ascani, which resulted in a combined net loss of $577,332.37.[23] As with the two previous loss amounts, the United States claims that due to the years' long fraud that concealed this problem for the bank, it was put in an untenable position in 2009, and had to sell the loans at a loss.[24]

*2. Harper's Argument*

Harper claims that the United States has failed to prove that the losses were caused by the fraud instead of alleged mismanagement by FCB.[25] Harper argues that the United States did not introduce evidence where a false verification of deposit on a loan led to a loan loss.[26] In addition, Harper avers that the United States failed to prove that the nominee loans the defendants have

---

[20] *Id.*

[21] *Id.* at pp. 3-4.

[22] *Id.* at p. 4.

[23] *Id.*

[24] *Id.*

[25] Rec. Doc. 114 at p. 1.

[26] *Id.* at p. 4.

admitted they used were ultimately rolled over into loans for FCB that were not paid.[27]

Harper does not deny that he held NSF checks in limbo for Fouquet, but claims that they always "made good" on these checks, and therefore the United States failed to show a loss.[28] Further, Harper claims that the loss on the Michael Ascani ("Ascani") loans is not attributable to the defendants' fraud. Ascani was a business associate of Fouquet, and two of his loans had "draws" on them, meaning that funds from these loans were used to pay off other nominee loans.[29] Ascani's other loans were related to a Fouquet/Ascani company, and those loans had collateral that was cross pledged to other Fouquet related loans.[30] As such, the Government included the losses on these loans in its calculation. Harper claims that the loss amounts on these loans should not be attributed to the defendants' fraud because at all times Ascani had the means to pay his loans in full, but FCB offered him a substantial discount to pay them all off at once.[31] Relying on the testimony of Donald Coker ("Coker"), the defendants' expert, Harper claims that there was no business justification for the discount offered to Ascani, and therefore the loss associated with those loans should not be attributable to the defendants' actions.[32]

Harper further relies on the testimony of Coker to claim that the losses incurred by FCB were caused by "macro-economic" forces, and not his fraud.[33] Harper also claims that the discounted sale

---

[27] *Id.* at pp. 5-6.

[28] *Id.* at pp. 6-7.

[29] Rec. Doc. 112 at p. 147:4-19.

[30] *Id.* at pp. 147:23-148:9.

[31] Rec. Doc. 114 at pp. 7-8.

[32] *Id.* at p. 8.

[33] *Id.* at p. 9.

to 110 Capital, LLC was a self-inflicted wound by FCB, which he claims was further demonstrated when 110 Capital, LLC was later able to sell the assets for a profit.[34]

### 3. Fouquet's Argument

Like Harper, Fouquet claims that the United States can prove no actual loss attributable to the fraud.[35] Fouquet claims that the nominee loans were cured when the loans were eventually paid off in full, and therefore there was no loss.[36] Further, Fouquet argues that the United States did not prove that any of the loans it identified were in fact nominee loans. However, Fouquet contends that even if the losses were "caused" by the offense, they are not "attributable" to the offense, because it was not reasonably foreseeable that the market would crash.[37]

### 4. United States' Reply to the Defendants' Arguments

The United States attacks several of the arguments asserted by the defendants at the loss calculation hearing. First, the United States argues that the Court should find that the testimony of the defendants' expert, Donald Coker, was not credible. The United States points to the expert's admission that in determining that no loss occurred as a result of the defendant's conduct, he did not consult the Sentencing Guidelines nor did he consider how it defines loss amount.[38] Further, the expert agreed that his report was inaccurate when it stated that the defendants followed nationwide banking and lending practices and engaged in "honesty in fact" and "good faith, fair dealing, [and]

---

[34] *Id.* at pp. 10.

[35] Rec. Doc. 115 at p. 7.

[36] *Id.* at p. 8.

[37] *Id.* at p. 9.

[38] Rec. Doc. 113 at p. 5.

ordinary care," despite the defendants already having pleaded guilty to fraud.[39]

In addition, the United States claims that the economic downturn was not the cause of the bank's losses. The United States avers that the defendants' fraud began before the financial crisis, and therefore it was the fraud that triggered FCB's losses.[40] The United States claims that "[g]iven the defendants' years in banking and real estate, it was certainly foreseeable to them that engaging in multiple fraudulent schemes, over the course of four years, might have the impact of *compounding* the losses, especially if, as here, the market declined."[41] The Government cites the United States Court of Appeals for the Eighth Circuit in *United States v. Parish*,[42] where the court stated that "[t]he appropriate test is not whether market factors impacted the amount of the loss, but whether the market factors and the resulting loss were reasonably foreseeable."[43]

The United States also rejects an argument made by the defendants at the loss calculation hearing that Ascani was a guarantor of the Fouquet-related loans, and could have been called upon to pay the full amount at any time, and that therefore these loans should not be included in the loss calculation.[44] The United States points out that no evidence was presented to prove that Ascani was in fact a guarantor. Further, the United States claims that the defendants' argument that FCB could have held on to the loans and mitigated their losses fails because case law holds that a victim need

---

[39] *Id.*

[40] *Id.* at p. 6.

[41] *Id.* (emphasis in original).

[42] 565 F.3d 528 (8th Cir. 2009).

[43] *Id.* at 535.

[44] Rec. Doc. 113 at p. 7.

not mitigate its losses in this context.[45] However, it is the United States' position that "the evidence reflected that each action undertaken by the bank in response to the fraud was well-reasoned in financial analysis."[46]

## B. Sentencing Enhancements

### 1. Sophisticated Means

#### a. United States' Argument

Pursuant to USSG § 2B1.1(b)(10)( C), a defendant's offense level should be increased by two levels if the defendant employed "sophisticated means." The United States argues that all the evidence presented at the hearing and admitted to in the factual bases[47] indicates that a 2-level enhancement is appropriate for employing sophisticated means. For instance, the United States argues that "the manufacturing of false/fraudulent documentation, the use of other individuals in perpetrating the scheme, and the use of specialized knowledge in the subject matter of the offense, are all present here."[48]

#### b. Fouquet's Argument

Fouquet argues that the sophisticated means enhancement is not applicable here because "[t]here has been no showing that the defendants utilized multijurisdictional operations or fictitious entities to execute or conceal the offense."[49]

---

[45] *Id.* (citing *United States v. Helfand*, 281 F. App'x 551 (7th Cir. 2008)).

[46] *Id.*

[47] Rec. Doc. Nos. 31, 37.

[48] Rec. Doc. 113 at p. 9.

[49] *Id.* at p. 10.

## 2. Jeopardizing the Soundness of a Financial Institution

### a. United States' Argument

Pursuant to USSG §2B1.1(b)(15)(B), a defendant's offense level should be increased by four levels if the offense "substantially jeopardized the safety and soundness of a financial institution." The United States claims that at the hearing, the bank's representative testified that as a result of the defendants' conduct, the soundness of the bank was jeopardized.[50] Moreover, the United States directs the Court to the testimony of the FDIC examiner who testified that the FDIC imposed the second most severe sanction against FCB and forced it to write-down hundreds of thousands of dollars in response.[51] The United States' witnesses both testified that the Fouquet-related loans brought FCB to the brink of collapse.[52]

### b. Fouquet's Argument

Fouquet argues that this enhancement should not be applied because the United States failed to present evidence that (1) the financial institution became insolvent; (2) the financial institution substantially reduced benefits to pensioners or insureds; (3) the financial institution was unable on demand to refund fully any deposit, payment, or investment; and (4) the financial institution was so depleted of its assets as to be forced to merge with another institution in order to continue operations.[53]

---

[50] Rec. Doc. 113 at p. 9.

[51] *Id.*

[52] *Id.* at p. 10.

[53] Rec. Doc. 115 at p. 9 (citing USSG § 2B1.1, Application Note 12(A)).

### 3. Aggravating Role

#### a. United States' Argument

Pursuant to USSG §3B1.1(C), a defendant's offense level will increase by two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." The United States argues that aggravating role enhancement is appropriate because the defendants "acted as organizers, leaders, managers, or supervisors, in relation to the fraud scheme."[54] The United States argues that Fouquet acted as an organizer for the straw borrowers.[55] The United States also contends that "Harper's use of bank employees to carry out his orders including crediting insufficient checks and/or crediting false verifications of deposit in FCB records, renders him a leader [] under the Guidelines."[56]

### 4. Abuse of Position of Trust or Use of Special Skill

#### a. United States Argument

Pursuant to USSG 3B1.3, "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," the offense level is increased by two levels. The United States argues that it is clear from the factual basis that Harper abused his position of trust as FCB President and CEO.[57] The United States notes that the Sentencing Guidelines specifically state that a bank executive in charge of a fraudulent loan scheme warrants the application of this enhancement.[58]

---

[54] Rec. Doc. 113 at p. 9.

[55] *Id.* at p. 10.

[56] *Id.* (citing Rec. doc. 37 at pp. 5-6).

[57] *Id.*

[58] *Id.* (citing Application Note 1).

# III. Law and Analysis

### A. Loss Calculation

Section 2B1.1 of the Sentencing Guidelines defines loss for purposes of sentencing, and sets out the appropriate level enhancements based upon the amount of loss sustained by defendants' fraud. The Fifth Circuit has held that the United States must prove "factual" or "but-for" causation of loss amounts for it to be counted against the defendants for the purposes of sentencing under USSG §2B1.1.[59] In addition, there must be "legal causation." The Fifth Circuit has adopted the Seventh Circuit's definition of "legal cause" in this context: "there is a difference between 'but for' causation and the causation-for which the presence of but for causation is ordinarily a necessary condition but rarely a sufficient one- that imposes legal liability."[60] The Government bears the burden of proving loss.[61] However, a district court need only make a "reasonable estimate of loss."[62] A district court's factual findings at sentencing are reviewed for clear error, but its legal analysis is reviewed *de novo*.[63] The Fifth Circuit has also found that if a district court fails to consider extrinsic factors when approaching the loss calculation, this could be an abuse of discretion.[64]

At trial, the United States presented evidence that 23 loans held by FCB had a connection to the fraud perpetrated by the defendants.[65] The Court finds that the United States' exhibits, and the

---

[59] *Olis*, 429 F.3d at 545.

[60] *Id.* at 546

[61] *United States v. Hebron*, 684 F.3d 554, 562 (5th Cir. 2012).

[62] *Olis*, 429 F.3d at 545.

[63] *Id.*

[64] *Id.* at 548-49.

[65] Rec. Doc. 111 at p, 146:9-12.

testimony of the FDIC auditor and Sean Bourgeois, Vice President in charge of credit administration for FCB, proved that all of these loans were in fact part of and related to the fraud.[66]

After Harper's departure from FCB, the defendants' fraud was uncovered by the bank.[67] As an initial step to remedy the damage caused by the defendants, the FDIC required FCB to write-down the value of these loans by $520,955.71. Both the FDIC examiner and the Mr Bourgeois testified that this was done in order to reflect the differences in the collateral values.[68] Both of these individuals also testified that this loss is attributable to the defendants' fraud because had Harper and Fouquet not committed fraud beginning in 2005, the bank could have addressed the issues facing these troubled loans at an earlier date and prevented any or all of their losses.[69] In 2005 and after Hurricane Katrina, the real estate market was strong in St. Tammany Parish. By 2009, the area was affected by the national real estate and financial crisis.[70]

The Court finds the testimony of these individuals credible. Harper and Fouquet lied about the health of these loans and the underlying collateral for years. FCB only became aware of the true state of these loans and of the defendants' fraud after Harper left the bank. At this time, the collateral had already declined in value. The Court finds that the defendants' fraud and concealment directly caused the loss associated with the $520,955.71 write-down the FDIC required FCB to perform. Therefore, this amount is to be included for purposes of loss calculation and restitution.

---

[66] *See id.* at p. 174:14-21; Government' Ex. 5 at p. 1001.

[67] Rec. Doc. 111 at pp. 141:19-142:16.

[68] *Id.* at pp 78:6-79:15, 84:6-16; *id.* at pp. 150:16-155:9

[69] *Id.* at pp 80:4-91:3; *id.* at pp. 155:23-157:15.

[70] *Id.* at p. 182:3-6 ("Katrina really probably should have helped out market on the North Shore in '06. While it did drive some costs up to construct, the market got quite robust for us after the hurricane.") (testimony of Bourgeois).

The United States next claims that FCB incurred a loss when it undertook a second write-down of 18% of the outstanding value of the loans, resulting in a loss of $493,933.61. The United States explains that this write down was undertaken because "FCB realized they were unlikely to collect much, if anything, on the value of these loans."[71] Again, the United States argues that this loss amount is attributable to the fraud because had it been discovered earlier, FCB may have been able to mitigate its losses.

The Court finds that the United States failed to meet its burden to prove that this particular loss amount was attributable to the defendants' fraud. The evidence presented to this Court only demonstrated a speculative calculation made by the bank that it "was unlikely to collect much" on these loans. The United States did not establish that this additional write-down was caused by the fraud and in fact, admitted that "macro-economic" causes affected the loss as well. The first write-down was mandated by the FDIC, and reflected actual losses already incurred by the bank due to the devaluation of the collateral attached to the loans. Here, the write down was not mandated and was premised on a perceived inability to collect much on these loans. Moreover, even the Government's FDIC witness conceded that the market downturn caused, at least in part, the loss to the bank associated with the second write-down.[72] Therefore, the Court finds that the Government did not meet its burden in establishing this portion of the loss was caused by the defendants' fraud and so the Court will not include this amount for the purposes of loss or restitution.

The third source of loss the United States claims is attributable to the defendants' fraud occurred from the sale of the remaining Fouquet-related loans. Again, the United States argues that

---

[71] Rec. Doc. 113 at pp. 3-4.

[72] *Id.* at p. 124:11, 16-19.

this loss, $577,322.37, should be attributable to the defendants' fraud because by the time the bank was aware of the fraud in 2009, it was in an untenable position and could do little to mitigate any damages.

At the loss calculation hearing, the Court heard testimony that the FDIC instructed the bank to sell these assets, and that after careful consideration, the bank's Board of Directors unanimously approved the sale.[73] These assets were sold at a loss in order to immediately eliminate the risk from FCB's books. Mr. Bourgeois testified that the assets were sold because "[t]he offer that [110 Capital, LLC] made was acceptable to the bank. It was an immediate elimination of the risk from the bank's books. It removed a large portion of substandard assets off of our books, which we were required to do per the cease-and-desist order. And in the end, it was cash in our pockets, and we were able to put this behind us."[74]

The Court also heard Mr. Bourgeois explain in great depth the cost-benefit analysis FCB conducted when it decided to sell these loans. By immediately selling the loans to 110 Capital, LLC, not only was FCB able to receive an immediate cash injection and eliminate liability on its books, but when FCB accounted for the costs it would have incurred from maintaining the assets and loans and not selling when it did, it calculated that retaining the assets and selling them a year later (assuming they could find a buyer) would have only netted FCB an additional $50,000 compared to its sale to 100 Capital, LLC.[75]

The Court finds that the United States failed to satisfy its burden in proving that the net loss on the loans of $577,322.37 was attributable to the defendants' fraud. Unlike the first write-down,

---

[73] Rec. Doc. 112 at pp. 161:19-166:11, 173:21-174:1; *id.* at 173:8-15, 85:11-12.

[74] *Id.* at p. 166:6-11.

[75] *Id.* at pp. 167-173.

this action was not mandated by the FDIC. Further, the United States provided the Court with no formula or calculation as to what loss may have been caused as a direct result of the defendants' fraud and what was caused by other factors, such as the market downturn. However, this Court finds that the United States did satisfy its burden to demonstrate that the approximately $50,000 loss FCB absorbed through its short sale to 110 Capital, LLC is attributable to the defendants' fraud. From Mr. Bourgeois's testimony, the Court finds that FCB's short sale was a reasonable business judgment prompted by the position the defendants' fraud had placed FCB in, and was therefore justifiable. FCB reasonably wanted to eliminate troubled assets that had been part of the defendants' fraud from its ledger, and made a prudent business judgment to sell these assets promptly. Thus, the Court finds that adding an additional $50,000 to the loss amount is a reasonable estimate of the loss the defendants' fraud is responsible for from this sale.

The defendants have argued that their fraud caused no loss, but that instead it was caused by the economic downturn and/or mismanagement by the bank after Harper resigned. In support of this theory, the defendants presented an expert witness, Coker. The Court finds that the testimony of this individual was not credible and gives it very little weight. Despite the defendants having already plead guilty to fraud, this expert claimed that at all times the defendants engaged in "honesty in fact" and "good faith, fail dealing, [and] ordinary care." On cross examination this expert admitted that those statements, and those made in his report, were not accurate.[76] He was also not familiar with the Sentencing Guidelines or how "loss" is defined therein.[77]

The defendants also presented the testimony of Julian Rodrique, Jr. ("Rodrigue"), an attorney

---

[76] *Id.* at pp. 311:25-312:2.

[77] *Id.* at pp. 289-90.

who concentrates in real estate transactions and development.[78] The defendants elicited testimony from Rodrigue to support their theory that FCB's alleged mismanagement of the loans was responsible for the loss, not the defendants' fraud.[79] However, on cross-examination, the credibility of this witness was also put into question. Rodrigue admitted that he was in business with Fouquet and Ascani in a development project; yet he also presided over loan closings and real estate closings for banks, financial institutions, and other parties, which involved Fouquet. Despite this apparent conflict of interest, Rodrigue could not "recall" if he had ever disclosed that he was in business with Fouquet to the bank or buyers of these loans prior to his conducting the closings.[80] Based on these admissions, the Court finds that Rodrigue's testimony was not credible; his inability to perceive how his actions and behavior could be adverse to his own clients reflects his inability to appreciate the impropriety of the defendants' behavior. This was made clear by his testimony. The Court is also troubled by the defendants' decision to rely on the testimony of both Coker and Rodrigue. These individuals expressed a capricious attitude toward the law and their ethical obligations, and refused to attribute any responsibility to the defendants, even after they had already pled guilty.

The Court finds that the evidence at the hearing demonstrated that the defendants' fraud was responsible for the losses detailed and differentiated above, not the economic downturn, mismanagement by the bank after Harper left, or other factors. As noted above, the Eighth Circuit has previously held that "[t]he appropriate test is not whether market factors impacted the amount of the loss, but whether the market factors and the resulting loss were reasonably foreseeable."[81] In

---

[78] *Id.* at p. 336.

[79] *See id.* at p. 347.

[80] *Id.* at pp. 353-54.

[81] *Parish*, 565 F.3d at 535.

the absence of Fifth Circuit precedent directly on point on this issue, the Court adopts the Eighth Circuit's reasoning.[82] While the Fouquet-related loans were delinquent, and the collateral backing up the loans was devaluing, the defendants covered up these issues. This prevented FCB from taking reasonable action to address the issue while the market was still strong. These losses were reasonably foreseeable to the defendants, who had expertise in this industry, because the defendants had knowledge of the trouble the loans were in while they were committing fraud to conceal the problems with these loans.

The defendants have tried to put forward several other reasons why no loss should be attributed to their fraud. For instance, they claim that another individual was a guarantor on the loans, but FCB failed to pursue him. However, the defendants presented no evidence proving this man, Ascani, was a guarantor. The Court finds that the defendants did not provide sufficient evidence at the hearing to diminish the Government's evidence that their fraud was the direct cause of the losses outlined above by the Court. Therefore, the Court finds that the defendants' fraud was the direct result of the $520,955.71 loss from the FDIC-mandated write down and the $50,000 loss sustained from the sale of the assets to third parties, for a total loss of $570,955.71. The Court finds that this is a reasonable estimate of the loss adduced from the evidence presented at the loss calculation hearing.[83]

---

[82] *But see*, *Olis*, 429 F.3d at 546 (holding that a district court should have considered if a defendant's impact on the stock market could have been "reasonable foreseen").

[83] *See id.*

***B. Sentencing Enhancements***

*1. Sophisticated Means*

"Sophisticated means" is expressly defined in the commentary to the sentencing guidelines as follows: "Sophisticated means means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."[84]

A district court's determination of the applicability of this enhancement is reviewed for abuse of discretion.[85] The Fifth Circuit has acknowledged that "the bar is low" as to the conduct that is sufficient to implicate this enhancement.[86] The Fifth Circuit will uphold a district court's finding that sophisticated means were employed even in the absence of "offshore bank accounts or fictional entities."[87] Fifth Circuit jurisprudence discussing the applicability of this enhancement focuses on whether there were actions taken "to obscure the link between the money" and the defendant, which made it more difficult to discover the illicit activity.[88]

Here, the defendants' have admitted in their guilty pleas to using nominee loans, NSF checks, and various other devices to hide their offenses and obscure the link between themselves and the

---

[84] USSG § 2B1.1(b)(10), Application Note 8(B).

[85] *United States v. Wright*, 496 F.3d 371, 377 (5th Cir. 2007).

[86] *Id.* at 379.

[87] *United States v. Clements*, 73 F.3d 1330, 1340 (5th Cir. 1996)

[88] *Id.*

fraud. Therefore, the Court finds that this enhancement is appropriate as to both defendants.

### 2. Jeopardizing the Soundness of FCB

In interpreting this enhancement, the Fifth Circuit has acknowledged that the controlling commentary in the Sentencing Guidelines on this enhancement states that an offense "substantially jeopardized the safety and soundness of a financial institution" when "as a consequence of the offense, the institution became insolvent; substantially reduced benefits to pensioners or insureds; was unable on demand to refund fully any deposit, payment, or investment; was so depleted of its assets as to be forced to merge with another institution in order to continue active operations; or was placed in substantial jeopardy of any of the above."[89]

At the hearing, the Court heard testimony concerning the precarious situation FCB was placed in due to the defendants' fraud. The Court also heard the testimony of the FDIC inspector and Mr. Bourgeois, who testified that the Fouquet-related loans constituted a substantial part of FCB's exposure and the loss on the loans placed the bank in a dire financial situation.[90] The Court finds that the evidence demonstrated that the size of the fraudulent loans, when compared to the total assets of FCB, put the bank in substantial jeopardy of becoming insolvent. However, the Court finds that this enhancement is only applicable as to Harper. As President and CEO of FCB at the time of the fraud, Harper was in a unique position to make decisions and take actions on behalf of the bank that could jeopardize its financial health. Therefore, the Court will apply this enhancement to Harper.

---

[89] *United States v. McDermot*, 102 F.3d 1379, 1381-82 (5th Cir. 1996).

[90] Rec. Doc. 112 at pp. 93:12-94:6; *id.* at pp. 175:7-176:2; *id.* at 180:10-12.

*3. Aggravating Role*

Pursuant to USSG § 3B1.1, the United States seeks to add a two-level enhancement to the defendants' offense levels for acting as organizers and leaders in the offense. This enhancement is applicable when defendants are organizers, leaders, managers, or supervisors of more than one participant.[91] The defendants' factual bases and the evidence presented at trial proved that the defendants utilized several people, through nominee loans and straw buyers, to commit their fraud. Therefore, the Court finds that this enhancement is applicable as to both defendants.

*4. Abuse of Position of Trust or Use of Special Skill*

Pursuant to USSG § 3B1.3, the United States seeks to add a two-level enhancement to Harper's offense level for abusing a position of trust as he was the President and CEO of FCB. This enhancement is applicable when a person holds a position that is subject to significantly less supervision than other employees and therefore his position allows him to conceal his offense.[92] The commentary to this enhancement specifically lists "a bank executive's fraudulent loan scheme" as an example of when this two-level enhancement should apply.[93] The Court finds that this enhancement is applicable as to Harper.

## C. Sentencing Reductions

The defendants seek a 3-level reduction in their offense levels based upon USSG §3E1.1. Under USSG §3E1.1(a), a defendant may receive a two-level decrease if he "clearly demonstrates acceptance of responsibility for his offense." If a defendant qualifies for a two-level decrease under USSG §3E1.1(a), he may receive an additional 1-level reduction upon the motion of the government

---

[91] USSG § 3B1.1, Application Note 2.

[92] USSG § 3B1.3, Application Note 1.

[93] *Id.*

stating that he "assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a pleas of guilty," pursuant to USSG §3E1.1(b). Here, the United States has filed such a motion on behalf of both defendants, requesting the full three-level reduction.[94]

Defendants must prove that they are entitled to credit for acceptance of responsibility, and because the district court is in unique position to evaluate a defendant's acceptance of responsibility, the Fifth Circuit will review a district court's underlying factual findings and ultimate determination "under a standard even more deferential than clear error."[95] "The mere entry of a guilty plea [] does not entitle a defendant to a sentencing reduction for acceptance of responsibility as a matter of right."[96] "Entry of a guilty plea prior to commencement of trial combined with a truthful admission of involvement in the offense and related conduct will constitute significant evidence of acceptance of responsibility. However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility."[97] "Before a defendant is entitled to reduction for acceptance of responsibility, he must first accept responsibility for all of his relevant criminal conduct."[98]

Although the Government has stated that the defendants should receive the 3-level reduction for acceptance of responsibility, the position the defendants took in the loss calculation hearing in

---

[94] Rec. Doc. 118.

[95] *United States v. Diaz*, 39 F.3d 568, 571 (5th Cir. 1994).

[96] *United States v. Shipley*, 963 F.2d 56, 58 (5th Cir. 1992) (pur curiam).

[97] § 3E1.1, Application Note 3; *see also Shipley*, 963 F.2d at 58 (quoting Application Note 3).

[98] *United States v. Mouring*, 914 F.2d 699, 705 (5th Cir. 1990), *statutorily overruled in part on another issue.*

characterizing their actions (separate and apart from how the loss was to be calculated) and the evidence they chose to present characterizing their behavior as honest, and suggesting it was normal business practice, demonstrates that both defendants have not accepted the full breadth of their responsibility in this matter. Further, the objections the defendants made to the presentence reports regarding the elements previously admitted to in the factual bases and included in the Bill of Information also demonstrates their failure to accept responsibility for their actions.

In *United States v. Shipley*, the Fifth Circuit acknowledged that "a defendant who is found to have had a leadership role in the offense does not fully accept responsibility for purposes of § 3E1.1 if, despite his admission of all elements of the offense of conviction, he nevertheless attempts to minimize his leadership role."[99] In *Shipley*, the defendant sought the 3-level reduction allowed under § 3E1.1, but challenged the imposition of an enhancement for having a leadership role in his offense.[100] A similar situation has arisen here regarding Harper.

The United States has alleged that the defendants deserve a two-level enhancement under § 3B1.1(c) for acting as organizers, leaders, managers or supervisors in relation to the fraud scheme.[101] Despite admitting to such conduct in his factual basis,[102] and the evidence presented at the loss calculation hearing, Harper has challenged the imposition of this enhancement.[103] The evidence that Harper was a leader in the fraud is overwhelming. He was President and CEO of FCB, and was absolutely essential in committing the fraud. By refusing to admit his leadership role in this fraud,

---

[99] 963 F.2d at 59 (citing *Mouring*, 914 F.2d at 705).

[100] *Id.*

[101] *See* Rec. Doc. 113 at p. 10.

[102] Rec. Doc. Nos. 31, 37.

[103] Rec. Doc. 116 at p. 29 (Objection 6).

Harper has attempted to minimize his leadership role and has failed to accept full responsibility for the entirety of his criminal conduct. Therefore, the Court finds that Harper is not entitled to the 3-level reduction under §3E1.1(a) or (b) for acceptance of responsibility or for timely notifying the Government of his intention to plead guilty.[104]

While Fouquet has not challenged the imposition of this enhancement for having a leadership role, both he and Harper have taken other actions that demonstrate to this Court that they have not taken responsibility for all of their relevant criminal conduct. Again, while admitting various fraudulent activities, both defendants have persisted in their claims that this fraud caused no loss to the victim bank, FCB, and that the actions of others account for all of the loss.[105] Further, although the March 15, 2013 hearing was set for the purpose of evaluating the losses attributable to the defendants' conduct, they persisted in attempting to argue defenses for their behavior and tried to re-characterize or mitigate their actions. They claim responsibility for zero dollars of loss, and therefore attempt to escape any obligation to provide restitution, although they admitted in the factual basis that their actions did in fact, cause a loss to the bank. As outlined above, the defendants have made various excuses for the loss as to the bank, refusing to admit that a single cent was caused by their fraud. These actions indicate to the Court that the defendants have not accepted full responsibility for their crimes.

Moreover, in addition to denying that their fraud caused any loss to FCB, at the loss calculation hearing, the defendants put forward an expert, Coker, who in his expert report stated that:

---

[104] *See Diaz*, 39 F.3d at 571 (clarifying that only a defendant who qualifies for a downward adjustment under §3E1.1(a) may obtain an addition 1-level reduction under §3E1.1(b)).

[105] *See* Rec. Doc. 114 at p. 8 ("Harper proved that FCB did not suffer actual losses as a result of his conduct.") (Harper's post-hearing brief); Rec. Doc. 115 at p. 6 ("Loss under USSG § 2B1.1(b)(1) should be determined as zero.") (Fouquet's post-hearing brief).

> Mr. Harper followed nationwide banking and lending industry standard policies, practices, principles and procedures appropriate for the times in his efforts to deal with the problems created by the rescinding of the permanent mortgage takeout commitments that would have paid off the loans he and the Bank made to Mr. Fouquet's purchasers. Furthermore, it is my firm opinion that none of the actions or inactions of Mr. Harper caused any of the losses, if indeed there were any losses, that may have been sustained by the Bank.[106]

At the loss calculation hearing, Coker, the defendants' expert, further tried to minimize the seriousness of the crimes admitted to by the defendants: "If you want to go prosecute people that are doing things in banks, I can give you plenty of names of people that I'm seeing in other cases that have done much worse than this and put money in their pockets, and they're still walking around."[107] From Coker's expert report, the defendants knew the nature of this testimony. Knowing Coker's belief that we should not "prosecute people who are doing things in banks," the defendants decided to present him at the hearing in an attempt to marginalize their culpability with disturbing insights into the world of banking that fraud constitutes "fair dealing" and "good faith."[108] All of this evidence informs the Court that neither Harper nor Fouquet appreciate the illegality of their behavior nor do they truly acknowledge responsibility, and are therefore not deserving of the reductions allowed for under § 3E1.1.[109]

---

[106] Rec. Doc. 108-1 at p. 7.

[107] Rec. Doc. 112 at p. 310.

[108] *Id.*

[109] Although Coker was called by Harper, Fouquet did nothing to distance himself from the testimony presented by Coker.

## IV. Conclusion

Upon this Court's finding that the loss sustained by FCB as a result of the defendants' fraud was $570,955.71, each defendant will receive a 14-level increase from the base level of 6 for their fraud under § 2B1.1. Additionally, both defendants are responsible for restitution in this amount pursuant to 18 U.S.C. § 3663A. The Court has finds that the sophisticated means (2-level enhancement) and aggravating role (2-level enhancement) sentencing enhancements are applicable to both defendants. Moreover, the Court finds that neither defendant is entitled to the 3-level reduction allowed under USSG § 3E1.1 for acceptance of responsibility.[110] Therefore, Fouquet's total offense level is 24.

However, the Court also finds that Harper is responsible for jeopardizing the soundness of FCB (4-level enhancement) and for abusing a position of trust (2-level enhancement). Therefore, Harper's total offense level is 30. The Court makes these findings based on the record, the briefings, argument of counsel, and all other evidence presented before, during, and after the loss calculation hearing.

New Orleans, Louisiana, this __4th__ day of April, 2013.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[110] As such, the Court will deny the United States Motion for Defendants' Acceptance of Responsibility and Three-Level Decrease under the Sentencing Guidelines. Rec. Doc. 118.